United States District Court
Southern District of Texas

**ENTERED**

July 17, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALTON WILLIAMS JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-1061 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 14) and Defendant's Cross-Motion for Summary Judgment (Doc. 15).  The court has considered the motions, the responses, the administrative record, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED IN PART AND DENIED IN PART** and Defendant's motion be **DENIED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 2, Ord. Dated Apr. 12, 2017.

**A.   Medical History**

Plaintiff was born on June 24, 1975, and was thirty-nine years old on the alleged disability onset date of June 30, 2014.[2] Plaintiff had a high school education and worked as a cryptology technician at the time he quit working in 2014.[3]

**1.  Mental Impairments**

Plaintiff underwent a psychological evaluation by Jan Richter, M.D., ("Dr. Richter") on April 23, 2015.[4]   Plaintiff stated that he had served in Afghanistan in 2011 and was medically discharged from the Navy after fifteen years of service.[5]   Plaintiff reported that he was having difficulty sustaining employment "[m]ostly due to physical limitations."[6]   For mental health treatment, Plaintiff expounded that, in 2013, he had undergone treatment through counseling and medication, but found that the effectiveness of the medication decreased over time.[7]   Dr. Richter noted the following symptoms: depressed mood, decreased interest in enjoyable activities, irritability, concentration and memory problems, difficulty sleeping, low energy, isolation, feelings of

---

[2]      See Doc. 7, Tr. of the Admin. Proceedings ("Tr.") 185.

[3]      See Tr. 43, 244.

[4]      See Tr. 1065-69.

[5]      See Tr. 1066-67.

[6]      Id.

[7]      See Tr. 1067.

worthlessness, and lack of motivation or a plan.[8]

Dr. Richter explained that Plaintiff's post traumatic stress disorder ("PTSD") originated from "seeing [a] lot of death" while he was deployed.[9] This caused him to "feel[] on edge" and be "on guard at night."[10] Plaintiff did not realize that he was experiencing PTSD symptoms until he returned from deployment.[11] Plaintiff reported no suicidal ideation.[12] Plaintiff's PTSD symptoms were listed as follows:

> Nightmares 3-4 times a week,
> Intrusive thoughts three times a week
> Psychological distress at exposure to internal/external cues,
> Avoidance of thoughts, feelings, conversations,
> Avoidances of activities, places, or people,
> Diminished interest or participation in significant activities
> feeling detached or estranged from others
> Restricted range of affect
> Anger/irritability,
> Sleep difficulty[13]

Dr. Richter indicated that Plaintiff did not want to undergo psychotherapy unless medication did not alleviate his symptoms.[14] In a mental status examination, Dr. Richter assessed that his mood

---

[8]  See Tr. 1067-68.

[9]  Tr. 1068.

[10]  Id.

[11]  See id.

[12]  See id.

[13]  Id.

[14]  See Tr. 1069.

was "variable" and his affect was "[c]ongruent with mood," but that he had fair insight and judgment, was rational, independent, goal-oriented, cooperative, polite, and his psychomotor activity and speech were unremarkable.[15]

On July 28, 2015, Dr. Richter referred Plaintiff to treating physician Debra M. Emmite, M.D., ("Dr. Emmite") for a medication consultation.[16]   Dr. Emmite reported that while Plaintiff was cooperative, calm, logical, goal-oriented, coherent, and attentive, he was depressed.[17]   Dr. Emmite assessed that he had a global assessment of functioning ("GAF") score of 55, indicating moderate symptoms.[18]   Plaintiff was prescribed bupropion[19] for his mood and hydroxyzine[20] for anxiety and sleep.[21]   Also, Plaintiff decided to enroll in therapy.[22]

On August 10, 2015, Plaintiff reported that the hydroxyzine prescribed on July 28, 2015, was "making [him] feel like a zombie."[23]   Plaintiff was instructed to reduce his dose from twice

---

[15]    Tr. 1067.

[16]    See Tr. 1029-39.

[17]    See Tr. 1035.

[18]    See Tr. 1023.

[19]    Bupropion is also known as Wellbutrin or Zyban.

[20]    Hydroxyzine is also known as Atarax or Vistavil.

[21]    See Tr. 1037.

[22]    See id.

[23]    Tr. 1024.

4

a day to one dose in the evening and additionally as needed.[24]

Plaintiff saw Dr. Richter for a psychotherapy appointment on September 2, 2015.[25]  Plaintiff reported that he was not responding well to his medication, as it was causing him to experience a "hollow spaced out loopy feeling."[26]  Plaintiff's mood was dysphoric, and he was diagnosed with PTSD and dysthymic disorder.[27]

Plaintiff returned to Dr. Emmite on September 30, 2015, where he reported that he was feeling the same as at his previous appointment.[28]  Plaintiff reported that he was "moderately depressed," experienced anxiety most days, and had panic attacks twice a week.[29]  Plaintiff's relationship with his family was "good."[30]  Plaintiff's anxiety symptoms were the worst at night, when he would feel "hypervigilant" and have "traumatic nightmares."[31]  Plaintiff's appetite was inconsistent, and, due to difficulty sleeping, Plaintiff's energy levels were low.[32]

---

[24]  See id.

[25]  See Tr. 1242-46.

[26]  Tr. 1243.

[27]  See Tr. 1244.

[28]  See Tr. 1127.

[29]  Tr. 1128.

[30]  Id.

[31]  Id.

[32]  See id.

Plaintiff did not report experiencing suicidal ideation or psychotic symptoms.[33]  Dr. Emmite listed Plaintiff's depression symptoms as follows: depressed mood, markedly diminished interest or pleasure in activities, appetite/weight change, insomnia/hypersomnia, loss of energy/fatigue, feelings of worthlessness or excessive or inappropriate guilt, low self esteem, and some feelings of hopelessness.[34]  His mental status examination revealed a "depressed" mood and "slightly blunted" affect, but was otherwise normal.[35]  As Plaintiff was still experiencing drowsiness from hydroxyzine, it was eliminated from his medication regimen, and his dose of bupropion was increased and paroxetine[36] was added to treat his depression and anxiety.[37]

Plaintiff saw Dr. Emmite again on December 3, 2015, complaining that he "didn't really want to be around relatives for Thanksgiving."[38]  It was noted that Plaintiff was diagnosed with PTSD by the Department of Veterans Affairs ("VA") and found to be one hundred percent disabled.[39]  Plaintiff reported that he was not

---

[33]    See id.

[34]    See id.

[35]    Tr. 1131.

[36]    Paroxetine is also known as Paxil.

[37]    See Tr. 1133.

[38]    Tr. 1204.

[39]    See id.

feeling depressed but he was "irritable and anxious almost every day."[40]  Plaintiff was not taking his paroxetine regularly and was instructed that he needed to take it on a regular basis.[41] Plaintiff reported panic attacks one to three times a week and traumatic nightmares two to three times a week.[42]  In a mental status examination, Dr. Emmite assessed that he had a euthymic affect and an irritable mood, but was otherwise normal.[43]

On December 15, 2015, Dr. Emmite completed a mental capacity questionnaire, opining that Plaintiff could perform simple, repetitive tasks, but could not work on a full-time basis for a period of at least twelve months.[44]  In support of this finding, Dr. Emmite explained that Plaintiff has the following symptoms:

> Mood instability, can't be in crowds, recurrent intrusive distressing memories, nightmares, flashbacks, physiological reactions and avoidance of reminding cues, hypervigilance, insomnia, [and] problems with concentration.[45]

Dr. Emmite completed another questionnaire on April 14, 2016.[46] As to Plaintiff's depression, Dr. Emmite noted the following symptoms: anhedonia or pervasive loss of interest in almost all

---

[40]     Id.

[41]     See id.

[42]     See id.

[43]     See Tr. 1208.

[44]     See Tr. 1274.

[45]     Id.

[46]     See Tr. 1347-53.

activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, and feelings of guilt or worthlessness; addressing Plaintiff's anxiety, Dr. Emmite noted that he displayed: vigilance and scanning, recurrent severe panic attacks, and recurrent and intrusive recollections of a traumatic experience, but not recurrent obsessions or a persistent fear of a specific object, activity, or situation.[47] Dr. Emmite referred to Plaintiff's PTSD and explained that he had "problems with irritability, anxiety, energy, appetite, sleep-all impaired," as well as "intrusive traumatic memories, reactivity to all stimulus, traumatic nightmares, [and] hypervigilance."[48] Plaintiff was found to have moderate restrictions of activities of daily living, extreme difficulties in maintaining social functioning, mild deficiencies of concentration, persistence, or pace, and three repeated episodes of decompensation, each of extended duration.[49]

Dr. Emmite assessed that Plaintiff was not significantly limited in the following areas: the ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to understand and remember detailed instructions, the ability to carry out very short and simple instructions, the ability to carry out detailed

---

[47]   See Tr. 1347-48.

[48]   Tr. 1348.

[49]   See Tr. 1349.

instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to ask simple questions or request assistance, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.[50]  Dr. Emmite reported that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and the ability to accept instructions and respond appropriately to criticism from supervisors.[51]  Dr. Emmite found that Plaintiff was markedly limited in the following areas: the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[52]

On May 18, 2016, Plaintiff complained that, upon running out

---

[50]   See Tr. 1352-53.

[51]   See id.

[52]   See id.

of his medication one month prior, he was feeling more anger, irritability, and intolerance.[53]   Plaintiff indicated that he had ceased taking his medication, and he had been feeling "moderately depressed," irritable, and anxious on a daily basis.[54]   Plaintiff was having panic attacks more frequently than before, at a rate of three times a week, and having traumatic nightmares four to five times a week.[55]   Plaintiff continued to report problems sleeping and hypervigilance at night.[56]   A mental status examination showed his mood was "kinda out of it" and affect was euthymic, but otherwise normal.[57]

Plaintiff returned for treatment for his mental health on September 14, 2016, and reported feeling irritable, anxious, reactive, and depressed almost every day.[58]   Dr. Emmite made the same findings about the frequency of panic attacks, nightmares, and mood issues as at the previous appointment.[59]

## 2.  Physical Impairments

An magnetic resonance image ("MRI") was performed of

---

[53]   See Tr. 1406.

[54]   Id.

[55]   See id.

[56]   See id.

[57]   See Tr. 1410.

[58]   See Tr. 1358.

[59]   See Tr. 1358-62.

Plaintiff's right wrist on November 17, 2014, and revealed that he had a complete tear of his scapholunate ligament and a small tear in his luntriquetral ligament.[60]  The MRI also showed that Plaintiff likely had a tear in his triangular fibrocartilage complex.[61] Another MRI was performed on December 18, 2014, after Plaintiff complained of left wrist pain.[62]  This MRI revealed a chronic tear in the scapholunate ligament and fluid that may have been physioligic joint fluid or tenosynovitis.[63]

On January 8, 2015, James B. Stafford, M.D., ("Dr. Stafford") performed right wrist surgery on Plaintiff.[64]  Plaintiff underwent a procedure to repair his right wrist joint and combat "significant" pain.[65]  In a follow-up on March 3, 2015, it was noted that Plaintiff was not experiencing any complications as a result of the surgery.[66]

Plaintiff presented to Sujatha Anand, M.D., ("Dr. Anand") with heel pain and right knee pain on September 30, 2015.[67]  As to the right knee, Dr. Anand noted Plaintiff's past two surgeries and

---

[60]    See Tr. 1092.

[61]    See id.

[62]    See Tr. 1086.

[63]    See Tr. 1088-89.

[64]    See Tr. 1077-85.

[65]    See Tr. 1082-83.

[66]    See Tr. 1086.

[67]    See Tr. 1117.

11

assessed there was tenderness on the inner side as well as a "free but painfull [sic]" range of motion.[68]   Plaintiff also displayed tenderness in his heel but his feet were "otherwise normal."[69]   Dr. Anand concluded that the x-rays showed "mild" arthritis in his right big toe joint, a small spur in his right heel, and arthritis in his right knee.[70]

Balakrishna Reddy Mangapuram, M.D., ("Dr. Mangapuram") performed a consultative examination on October 29, 2015.[71] Plaintiff recounted a history of back pain, right knee pain, foot pain, right wrist pain, gout, and surgeries to his right wrist and right knee.[72]   Plaintiff's main complaint was back pain, which worsened when Plaintiff stood, sat, walked, bent down, or lifted weight.[73]   Plaintiff also complained of "constant" pain in his right knee, rating it a nine out of ten and stating that it was worsened with use of his legs.[74]   Plaintiff reported foot pain that was "worse with any activity."[75]   Dr. Mangapuram assessed that Plaintiff's range of motion was normal, that he had no evidence of

---

[68]     Tr. 1119.

[69]     Id.

[70]     See Tr. 1109, 1121.

[71]     See Tr. 1101-04.

[72]     See Tr. 1101.

[73]     See id.

[74]     Id.

[75]     Id.

joint effusion, deformity, or tenderness.[76]  Straight leg testing was positive.[77]  Plaintiff's shoulder, hip, left knee, elbow, left wrist, ankle, foot, and neck movements were normal.[78]  Plaintiff had restricted movement in his spine, right wrist, and right knee.[79]  Dr. Mangapuram opined that Plaintiff could lift, carry, and handle objects less than eight pounds with his right hand, and less than twenty pounds with his left hand.[80]  Plaintiff could not toe walk, heel walk, squat, hop, or tandem and straight walk.[81]  Plaintiff did not need assistive devices to ambulate.[82]  Dr. Mangapuram performed x-rays of Plaintiff's lumbar and cervical spine; the x-ray of Plaintiff's cervical spin showed degeneration at C4-C5, C5-C6, and C6-C7.[83]

Plaintiff visited with an orthopedic specialist about his knee pain on November 9, 2015.[84]  Plaintiff reported that he was having high levels of pain in his right knee, especially on the inner side

---

[76]   See Tr. 1103.

[77]   See id.

[78]   See id.

[79]   See id.

[80]   See id.

[81]   See Tr. 1103-04.

[82]   See Tr. 1103.

[83]   See Tr. 1105-06.

[84]   See Tr. 1112.

13

of the joint.[85]

Plaintiff presented at the emergency room on December 9, 2015, for a left knee sprain after walking on a treadmill three days earlier.[86]  Plaintiff reported experiencing stiffness, swelling, and an increase in pain affecting his ability to walk, but he was able to put weight on his left leg and extend the knee.[87]

On December 18, 2015, Dr. Anand completed a physical capacity questionnaire.[88]  Dr. Anand concluded that Plaintiff could not meet the following levels of exertion for at least twelve months: standing and/or walking up to two hours of an eight-hour day, sitting six or more hours of an eight-hour day, lifting and/or carrying up to ten pounds occasionally, and lifting and/or carrying up to a few pounds frequently.[89]   Dr. Anand explained that Plaintiff's pain in his joints, lower back, neck, wrist, knee, and feet restricted his physical capacity.[90]

In July 2016, Plaintiff complained of pain in his right foot caused when he kicked a toilet at his home due to frustration in installing it.[91]  No fractures were found in his foot as a result of

---

[85]     See id.

[86]     See Tr. 1194, 1197.

[87]     See Tr. 1197-98.

[88]     See Tr. 1375.

[89]     See id.

[90]     See id.

[91]     See Tr. 1368, 1387, 1396.

this incident.[92]  When Plaintiff returned for a follow-up, Dr. Anand noted that he was having intermittent pain and swelling, but that the foot was capable of bearing weight.[93]

## B.  **Application to SSA**

On August 24, 2015, Plaintiff applied for disability insurance benefits claiming an inability to work since June 30, 2014.[94]  After Plaintiff filed for disability insurance benefits, the VA sent a letter confirming that Plaintiff received service-related disability benefits and that he had a one-hundred percent disability rating from the VA.[95]

In a disability report dated August 24, 2015, Plaintiff claimed that his ability to work was limited by the following conditions: PTSD, insomnia disorder, painful scars of right knee and upper extremities, bilateral pes planus,[96] right elbow degenerative joint disease with olecranon, cervical spine degenerative joint disease, right elbow with limited flexion, right wrist tenosynovitis scapholunate, right wrist dissociation and ligament rupture, and lumbar spine degenerative disc disease dextroscoliosis.[97]

---

[92]  See Tr. 1368.

[93]  See Tr. 1387.

[94]  See Tr. 185-91.

[95]  See Tr. 193.

[96]  Pes Planus is also known as flat feet.

[97]  See Tr. 252.

15

On September 28, 2015, Plaintiff's wife completed a disability report on his behalf, indicating that his ability to work was limited by pain caused by sitting and standing, inability to focus, problems with his short term memory, and intermittent depression.[98] Plaintiff's daily activities consisted of walking his child to and from the school bus, taking medication, assisting his child with homework, feeding his child, getting his child ready for school, and letting his pet in and out of the house.[99]   Plaintiff had some difficulty with dressing, bathing himself, and remembering to take his medication, and suffered from restlessness, insomnia, and nightmares at night.[100]   Plaintiff did not help with cooking, but would put the dishes away.[101]

Plaintiff's wife indicated that he went outside the home on a daily basis, was able to drive a car, and could leave the house by himself.[102]   Plaintiff shopped online monthly and could manage money, but his wife stated that he was "careless with money."[103] Plaintiff's hobbies consisted of "watching sports," which he engaged in twice a week.[104]   Plaintiff spent time with his parents twice a

---

[98]   See Tr. 259-69.

[99]   See Tr. 263.

[100]   See Tr. 263-64.

[101]   See Tr. 264.

[102]   See Tr. 265.

[103]   Tr. 265-66.

[104]   See Tr. 266.

16

week, regularly visiting their house, and he also attended to church.[105]   However, Plaintiff's wife reported that he was more irritable, isolated, disinterested, and temperamental then before the onset of his conditions.[106]

Plaintiff's abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, follow instructions, use his hands, and get along with others were affected by his conditions.[107]   Plaintiff could walk one hundred yards before stopping to rest for ten minutes.[108]   Plaintiff's wife reported that his concentration span lasted for ten minutes.[109] Plaintiff had a "fair" ability to follow written instructions and spoken instructions and to get along with authority figures but could not handle stress or changes in routine.[110]   Plaintiff utilized a cane, brace/splint, and glasses/contact lenses.[111]

In a disability report dated January 12, 2016, Plaintiff reported that he:

> stopped working due to injuries sustained during active military combat.   I remain unable to work due to worsening back, knee, and wrist pain.   I cannot stay in

---

[105]   See id.

[106]   See Tr. 267.

[107]   See id.

[108]   See id.

[109]   See id.

[110]   See Tr. 267-68.

[111]   See Tr. 268.

any position for periods of time and my range of motion
is limited.  I suffer from muscle spasms and limited
range of motion.  I suffer from migraines 2-3 times per
week which last 1-6 hours.  I isolate myself due to PTSD
and depression.  I have difficulty sleeping.[112]

Plaintiff completed a function report on February 2, 2016,
adding to the earlier report completed by his wife.[113]  Plaintiff
detailed his daily routine as follows: "taking a shower, getting
dressed, taking medications, feeding my pets, giving my pets water,
eating a meal, eating a snack, remaining in bed, taking a nap,
sitting outside, completing a household chore, [and] listening to
music."[114]  Plaintiff reported that prior to his conditions, he
worked, shopped, was active in community organizations, and
exercised.[115]  Plaintiff indicated some difficulty with personal care
tasks, such as moving in and out of the bathtub and dressing
himself.[116]  The only meals Plaintiff prepared were microwaveable or
sandwiches, and he said that his conditions prevented him from
cooking more complicated meals like he did before.[117]  Plaintiff
would "straighten up around the house" and make the bed on a daily
basis.[118]  Plaintiff explained that he did not handle money well due

---

[112]   Tr. 273.

[113]   See Tr. 279-90.

[114]   Tr. 280.

[115]   See Tr. 281.

[116]   See id.

[117]   See Tr. 282.

[118]   Tr. 283.

to migraines, poor memory, poor writing skills, and lack of motivation.[119]  Plaintiff reported not regularly shopping due to lack of motivation, anxiety, and compulsive spending.[120]  In terms of social activities, Plaintiff stated that he could no longer participate in social clubs and groups or go to the gym.[121]  Plaintiff's hobbies consisted of watching television and listening to music.[122]

Plaintiff listed his symptoms as follows:

pain; muscle spasms; stiffness; weakness; swelling; limited range of motion; numbness; tingling; lightheadedness; lack of stamina; fatigue; frequent urination; sensitivity to heat; migraines (sensitivity to light, sensitivity to noise, eye pain/pressure, nausea, need to rest in a quiet dark room—lasting 4-6 hours); hearing problems; mood swings; irritability; flashbacks; nightmares; feelings of depression (feelings of sadness, lack of interest in activities I once enjoyed, worthlessness, lack of motivation); feelings of anxiety (anxious over changes in my life/loss of income, feelings of worry, isolation/avoidance of others, tense feelings, racing thoughts); paranoia (I have feelings that people are out to get me. I feel like people are judging me. I think or feel like people are talking about me.); panic attacks (fear of losing control, feeling detached from oneself, shakiness, increased heartbeat, shortness of breath, feeling of immediate danger—lasting 6-15 minutes).[123]

In terms of "unusual behavior or fears," Plaintiff explained: "I

---

[119]    See Tr. 284.

[120]    See id.

[121]    See Tr. 285.

[122]    See Tr. 284-85.

[123]    Tr. 286.

have feelings of depression.  I have feelings of anxiety.  I experience mood swings.  I have panic attacks.  I experience paranoia.  I am irritable.  I have flashbacks.  I have nightmares that disrupt my sleep."[124]

Plaintiff filed a new disability report on March 4, 2016, in which he reported some updates:

> I experience difficulty with the following daily activities because of my symptoms: cooking; driving; shopping; chores; hobbies; social activities; handling finances.  I rely on a cane most of the time to get around.  I wear my right knee brace during all waking hours and I wear my left knee brace if I am going to be on my feet for a longer period.  I wear my right elbow brace daily and my left elbow brace at times.  I wear my right hand and wrist splint daily.  I use my crutches when I have a gout flare.  I experience difficulty with the following personal care needs because of my symptoms: bathing; dressing; hair care; using the toilet; shaving; feeding myself; sleeping.[125]

On December 8, 2015, the SSA found Plaintiff not disabled at the initial level of review.[126]  On February 16, 2015, the SSA again found Plaintiff not disabled upon reconsideration.[127]  Plaintiff requested a hearing before an ALJ.[128]  The ALJ granted Plaintiff's request and scheduled the hearing on October 3, 2016.[129]

---

[124]   Tr. 288.

[125]   Tr. 299.

[126]   See Tr. 81-94.

[127]   See Tr. 95-109.

[128]   See Tr. 122.

[129]   See Tr. 38-80, 155-59.

C.   **Hearing**

At the hearing, Plaintiff and a vocational expert, Susan Rapant ("VE" or "Rapant"), testified.[130]   Plaintiff was represented by an attorney.[131]

Plaintiff lived with his son, step-daughter, and wife, and his wife worked full-time for a logistics company.[132]   Plaintiff attained a high school education and then enlisted in the Navy, where he served as a cryptology technician.[133]   To perform that position, Plaintiff received training from the Navy and had a top-secret security clearance.[134]   When he was stationed on shore, his position largely consisted of studying and preparing for deployment; when he was on a Navy ship, he sometimes had to move around the ship, including going through narrow passageways and climbing stairs, but otherwise did not consist of physical labor.[135]   Plaintiff was deployed to Afghanistan from 2010 to 2011.[136]

Plaintiff's alleged conditions consisted of PTSD, degenerative disc disease in his lumbar spine and neck, dextroscoliosis,

---

[130]   See Tr. 38-80.

[131]   See Tr. 38.

[132]   See Tr. 42.

[133]   See Tr. 43.

[134]   See Tr. 43-44.

[135]   See Tr. 46-47.

[136]   See Tr. 50.

osteoarthritis in his right elbow, tenosynovitis in his right wrist, gout in his feet and knees, problems with his left wrist, and migraines.[137]   Plaintiff also underwent surgeries on his right knee and right wrist.[138]   Some of his injuries, including his wrist and back problems, stemmed from his time in combat in Afghanistan.[139] When Plaintiff was in combat, he was not performing the cryptology job.[140]   Plaintiff also traced his PTSD to his time in combat.[141]

Plaintiff explained that he looked for clerical work after leaving the military, as his job as a cryptologist did not translate well to civilian work.[142]   Plaintiff began to feel like he could no longer work in October 2014.[143]   Plaintiff attempted to work that month but he experienced difficulty concentrating and interacting with coworkers.[144]   When he began to have troubling thoughts while at work, he would take breaks to call his wife in an attempt to feel better.[145]   Plaintiff testified that he would not be able to perform full-time work due to his lack of ability to concentrate for many

---

[137]   See Tr. 48-52.

[138]   See Tr. 49.

[139]   See Tr. 50.

[140]   See Tr. 50-51.

[141]   See Tr. 52.

[142]   See Tr. 44, 54.

[143]   See Tr. 54.

[144]   See Tr. 54-57.

[145]   See Tr. 57.

hours at a time and his physical limitations.[146]

After Plaintiff left the military, he had difficulty interacting with his family, but he stated that this had improved within the six months before the hearing.[147] Plaintiff explained that he sometimes felt overwhelmed and needed time alone to feel less anxious.[148] When alone, Plaintiff watched television, read books, or read the sports section of the newspaper.[149] Plaintiff tried to avoid hearing about "politics, America, [or the] military" because his anxiety would return.[150] When Plaintiff experienced anxiety, he felt "an uncontrollable urge to get away from everything."[151]

Plaintiff attended his son's football games, but avoided the bleachers due to crowds and anxiety about falling, and he would sit under an umbrella because his medication made him susceptible to sunburn.[152] Plaintiff's wife did the grocery shopping and he sometimes accompanied her when needed to carry large items.[153]

Plaintiff explained that he had insomnia and that a new

---

[146]   See Tr. 71-72.

[147]   See Tr. 57-58.

[148]   See Tr. 58-59.

[149]   See Tr. 59.

[150]   Id.

[151]   Tr. 60.

[152]   See Tr. 66.

[153]   See Tr. 68-69.

medication was not addressing the problem.[154]   Plaintiff also took

an anti-depressant and medications to treat pain, high blood

pressure, migraines, and anxiety.[155]   Plaintiff's anxiety medication

was not taken on a daily basis because it would "incapacitate[] him"

and put him "in a vegetative state."[156]   Plaintiff took his anxiety

medication on the weekend when his wife was home to help him.[157]

During the week, Plaintiff helped his son with his homework, unless

it was a large project, when his wife would help out due to his

problems focusing.[158]   Plaintiff's medications occasionally made him

lose his appetite, and, as a result, he lost weight.[159]

Plaintiff experienced infrequent panic attacks and anxiety when

he was alone, and when he did have one it was not as severe because

he felt like he was "in control."[160]   However, when he was in

situations that were not under his control, his heart would race,

he would start sweating, and would need to "find a way to get

out."[161]  When Plaintiff experienced anxiety, he would walk away from

---

[154]    See Tr. 60-61.

[155]    See Tr. 62.

[156]    See id.

[157]    See id.

[158]    See Tr. 63.

[159]    See Tr. 69-70.

[160]    Tr. 70.

[161]    Id.

situations to calm down.[162]

Before Plaintiff underwent his second knee surgery, he used to walk on the treadmill.[163]  The ALJ asked Plaintiff how far he would be able to walk to which Plaintiff explained that, on a "good day," he could walk a few hundred feet before needing to rest for twenty to thirty minutes.[164]  Plaintiff explained that he could no longer lift weights or ride motorcycles due to his conditions.[165]  Plaintiff had not worked out with weights in a gym in a few years.[166]

For his PTSD, Plaintiff attempted to undergo counseling when he first left the military, but he did not have success with it.[167] Plaintiff explained that the counselor tried to broach topics that he was not ready to discuss at that time.[168]

At the conclusion of Plaintiff's testimony, the VE discussed Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[169]  The VE stated that Plaintiff's past relevant work as a cryptology technician met the Dictionary of Occupational Titles ("DOT")

---

[162]     See Tr. 64.

[163]     See id.

[164]     See Tr. 64-65.

[165]     See Tr. 67-68.

[166]     See id.

[167]     See Tr. 71.

[168]     See id.

[169]     See Tr. 73-80.

definition of a counter intelligence agent, a light, skilled position.[170]

The ALJ presented the following hypothetical individual:

Assume with me a hypothetical claimant of the same age, educational background and work experience as this gentleman. Further, assume that person is capable of doing medium duty work with the following further restrictions. Can only occasionally climb ladders, no ropes or scaffolds. Can only frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. Can only frequently handle and finger with the right upper extremity. Can only have occasional interaction with coworkers and the public. No limitation on interaction with supervisors. May be off task less than ten percent per day due to thoughts interfering with concentration, persistence, and pace. I find that there is no past work available, would there be other work available?[171]

The VE concurred that such an individual could not perform Plaintiff's past work.[172] However, the VE found that Plaintiff could perform medium, unskilled work as a laundry worker, hand packager, or kitchen helper.[173]

Plaintiff's attorney posed the following hypothetical individual:

Consider a hypothetical individual who needs a sit/stand option such that they would need the opportunity to alternate between sitting and standing. They can sit for an hour, but would need to [sic] the opportunity, excuse me, to stand every fifteen minutes on the hour. With their right upper extremity they would be limited to twenty pounds frequently less than ten pounds – I'm

---

[170]    See Tr. 74.

[171]    Tr. 74-75.

[172]    See Tr. 75.

[173]    See id.

sorry, twenty pounds occasionally, less than ten pounds
frequently.  They would only be able to occasionally
bend, stoop, kneel, crouch and crawl.  As it relates to
their ability to interact with others let's say no
interaction with the public, and the ability to interact
with supervisors.[174]

The VE explained that the medium, unskilled positions he listed
earlier would not be available, but that Plaintiff could perform
light, unskilled work as a mail clerk or office helper.[175]

Plaintiff's attorney added the limitation to his hypothetical
"that [the] individual notwithstanding their two fifteen minute
breaks and their lunch period, would need two additional breaks that
would last roughly fifteen minutes."[176]  The VE answered that there
would be no jobs available for such an individual.[177]  Plaintiff's
attorney also suggested the following limitation, notwithstanding
the first limitation, "that the individual would be off task at
least twenty percent of the time," and the VE replied that no jobs
would be available in the national or regional economy.[178]

Plaintiff's attorney then added the following limitation to the
ALJ's original hypothetical individual: "if that individual were to
be off task twenty percent of the time, however, performing at the
medium level with his limitations, would those jobs be available,"

---

[174]    Tr. 76.

[175]    See Tr. 77.

[176]    Tr. 78.

[177]    See id.

[178]    Id.

27

to which the VE answered "no."[179]

## D.  **Commissioner's Decision**

On November 21, 2016, the ALJ issued an unfavorable decision.[180] The ALJ found that Plaintiff met the requirements of insured status through December 31, 2019, and that Plaintiff had not engaged in substantial gainful activity since June 30, 2014, the alleged onset date.[181]   The ALJ recognized that Plaintiff had one severe impairment: PTSD.[182]  While not finding that Plaintiff's obesity was a severe impairment, the ALJ also considered the effects of obesity when deciding Plaintiff's residual functional capacity ("RFC").[183] Plaintiff also alleged "degenerative disc disease of the cervical and lumbar spine, dextroscoliosis, osteoarthritis of the right knee, osteoarthritis of the right elbow and tenosynovitis of the right wrist, and migraine headaches," but the ALJ found that the medical record did not support these limitations.[184]

Plaintiff's severe impairment did not meet or medically equal disorders described in the listings of the regulations[185] (the

---

[179]   Id.

[180]   See Tr. 17-33.

[181]   See Tr. 22.

[182]   See id.

[183]   See id.

[184]   Tr. 22-23.

[185]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

"Listings"), according to the ALJ.[186]  In particular, the ALJ considered Listing 12.06, related to anxiety and obsessive-compulsive disorders.[187]  The ALJ found that Plaintiff had no restriction in daily activities, mild difficulties in social functioning, moderate difficulties with concentration, persistence, or pace, and no episodes of decompensation.[188]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's claimed symptoms and his medical treatment and stated that he followed the regulatory requirements as to both.[189]  When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms.[190] Second, the he determined the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning," looking to other evidence in the record for those symptoms that are not substantiated by objective medical evidence.[191]

The ALJ discussed Plaintiff's medical treatment, including

---

[186]   See Tr. 25-26.

[187]   See id.

[188]   See Tr. 25.

[189]   See Tr. 26-31.

[190]   See Tr. 26

[191]   Id.

records from: MRIs of his wrists; his wrist surgery and follow-up; his April 23, 2015 mental status examination by Dr. Richter; his July 28, 2015 referral to Dr. Emmite and subsequent appointments through the end of the year; his September 30, 2015 examination by Dr. Anand; his October 29, 2015 consultative examination conducted by Dr. Mangapuram; his November 9, 2015 orthopedic appointment; his December 9, 2015 appointment for his sprained knee; and his September 14, 2016, mental health treatment from the VA.[192]  The ALJ explained that he accorded partial weight to Dr. Emmite's opinions, as they were inconsistent with the mental health status examinations in the record.[193]  The ALJ gave the reconsideration opinion by the state agency medical consultant some weight to the extent that it was consistent with the RFC finding.[194]  Dr. Anand's opinion was given little weight, Dr. Mangapuram's opinion was given little weight, and Dr. Emmite's opinions were given partial weight.[195]

The ALJ engaged in a thorough account of Plaintiff's testimony regarding the symptoms he experienced as a result of his impairments.[196]  Specifically, the ALJ discussed Plaintiff's work history, medication, activities, and symptoms associated with his

---

[192]    See Tr. 23-31.

[193]    See Tr. 31.

[194]    See id.

[195]    See Tr. 23-31.

[196]    See Tr. 25, 29-30.

30

impairments.[197]   The ALJ also noted Plaintiff's appearance at the hearing, finding it inconsistent with his testimony about his conditions.[198] The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limited effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."[199]

The ALJ found Plaintiff capable of performing medium work.[200] The following limitations were included in Plaintiff's RFC: (1) occasional interaction with coworkers and the public and (2) Plaintiff "may be off task less than ten percent of the day due to thoughts interfering with his ability to maintain concentration, persistence, and pace."[201]

The ALJ determined that Plaintiff was capable of performing his past relevant work as a cryptologic technician, as it did not require the performance of tasks precluded by the RFC finding.[202] However, because this is not a job commonly found in the national

---

[197]   See Tr. 30.

[198]   See id.

[199]   Tr. 31.

[200]   See Tr. 26.

[201]   Tr. 26.

[202]   See Tr. 31.

and regional economy, the ALJ analyzed whether there were other jobs that Plaintiff could perform.[203]   Plaintiff was considered a younger individual with a high school education and the ability to communicate in English.[204]   Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff could also perform other jobs in the national economy, including positions such as laundry worker, hand packager, and kitchen helper.[205]   The ALJ concluded that Plaintiff was not under a disability from June 30, 2014, through the date of the decision.[206]

Plaintiff appealed the ALJ's decision, and, on February 3, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[207]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[208]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of

---

[203]     See id.

[204]     See id.

[205]     See id.

[206]     See Tr. 32-33.

[207]     See Tr. 1-6.

[208]     See Doc. 1, Pl's Compl.

whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled

without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence.  Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the

Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) the ALJ should have found Plaintiff's PTSD disabling; (2) the ALJ failed to take into account Plaintiff's physical limitations; and (3) the ALJ should have given great weight to the VA rating.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.  Dr. Emmite and Dr. Mangapuram's Opinions

Plaintiff contends that the ALJ erred by not finding that his PTSD was a disabling condition.  Plaintiff asserts that the RFC finding did not incorporate all of his limitations that were supported by the medical evidence, specifically, Dr. Emmite's opinion.  Plaintiff also challenges the ALJ's determination that Dr. Mangapuram's opinion be given little weight, contending that the physical limitations should have been found to be severe.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. § 404.1527(c).  Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are likely to be the

medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."   20 C.F.R. § 404.1527(c)(2); see also Greenspan, 38 F.3d at 237 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2.

The ALJ is required to give good reasons for the weight given a treating source's opinion.  20 C.F.R. § 404.1527(c)(2);  SSR 96-2p, 1996 WL 374188, at *5.

> When the determination or decision . . . is a denial[,] . . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5.  The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, it is to be given controlling weight.  20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of

36

the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization. 20 C.F.R. § 404.1527(c)(2). However, the ALJ is only required to consider these factors in deciding what weight to give a medical source opinion; he is not required to record in writing every step of the process. 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

In his opinion, the ALJ explained that he:

> considered [Dr. Emmite's] opinion and afforded it partial weight as the mental status examinations routinely noted the claimant had no problems with attention and concentration in contrast to this opinion. In fact, mental status examinations generally were unremarkable. Furthermore, the GAF score and mental status examination performed previously by Dr. Emmite is in consistent with this opinion.[209]

As to the medical source statement completed by Dr. Emmite, the ALJ stated that he:

> considered this opinion and afforded it partial weight as it is internally inconsistent with regards to the claimant's ability to maintain concentration, persistence, and pace being noted as both mildly limited and markedly limited. Furthermore, the routine mental status examination findings at Exhibit 6F, 8F, 2F16, and

---

[209]    Tr. 28.

37

> 10F5-9 do not support the conclusions reached by Dr.
> Emmite. Additionally, the GAF score opined by Dr. Emmite
> at Exhibit 2F, page 9 is inconsistent with marked
> limitations as opined by Dr. Emmite at Exhibit 9F, page
> 3.[210]

Overall, the ALJ explained that he gave Dr. Emmite's opinions "partial weight" because they "were inconsistent with the mental status examinations throughout the record which reflect far less severe symptoms as well as the GAF score opined by Dr. Emmite in the record."[211]

Here, the ALJ considered the opinions of Dr. Emmite, only giving them partial weight for a multitude of reasons as set out in the ALJ's decision. Namely, the unremarkable findings and the GAF score of fifty-five were inconsistent with the limitations found by Dr. Emmite. The ALJ articulated his reasoning and the reasons he provided demonstrate that his findings as to Dr. Emmite's opinions were supported by substantial evidence. Plaintiff's argument is without merit.

Plaintiff also argues that the ALJ erred by failing to incorporate his physical limitations and by giving Dr. Mangapuram's opinion, which supported these physical limitations, "little weight." The ALJ explained that he:

> considered this opinion and afforded it little weight as
> Dr. Mangapuram saw the claimant on only one occasion.
> The medical evidence as a whole does not support the

---

[210]    Tr. 29.

[211]    Tr. 31.

38

> severity of restrictions opined. Furthermore, the
> claimant's physical appearance at the hearing was
> inconsistent with that of physical limitations, as he
> appeared able bodied and fit with visible muscle
> strength.[212]

The court finds that the ALJ's decision to give Dr. Mangapuram's opinion little weight was supported by substantial evidence. While other medical evidence in the record, such as Dr. Anand's records, did indicate that Plaintiff had physical problems such as pain and arthritis, there was no medical evidence in the record supporting the level of limitations that Dr. Mangapuram opined. The ALJ explained that he did not find Plaintiff's alleged physical limitations supported by the medical evidence. Therefore, the court will not reverse on this ground as the ALJ's decision is supported by substantial evidence.

## B.  **VA Rating**

Plaintiff contends that the ALJ erred by not considering and giving great weight to the VA's disability rating.

The VA and the SSA are governmental agencies that separately administer programs to provide disability benefits. Compare 38 C.F.R. §§ 4.1-4.31 (explaining the VA's procedures for rating disabilities), with 20 C.F.R. §§ 404.1501-404.1599 (explaining the SSA's procedures for determining disability). The programs employ different criteria in analyzing disability. See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).

---

[212]   Tr. 23.

The regulations that outline the VA's system for rating disabilities explain that the disability rating "is based primarily upon the average impairment in earning capacity." 38 C.F.R. § 4.15. "Total disability will be considered to exist when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation." 38 C.F.R. § 4.15. When an individual's rating is less than 100 percent, that individual may still be deemed unemployable if the VA determines that the individual would be "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a). The regulation outlines the eligibility requirements for "individual unemployability" in such circumstances. See 38 C.F.R. § 4.16(a).

Although a disability determination by another governmental agency is not binding on the SSA, such a determination "is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." Chambliss, 269 F.3d at 522; see also 20 C.F.R. § 404.1504 (discussing disability determinations by other organizations and governmental agencies). Generally, because a VA rating specifically makes a finding on disability, it, "like a physician's finding, constitutes evidence 'entitled to great weight.'" See Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994)(quoting Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. 1981)). An ALJ may discount a VA rating only if valid reasons are

cited.  Chambliss, 269 F.3d at 522 ("ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so."); see also Denney v. Colvin, 4:12-CV-565-Y, 2014 WL 169647, at *12 (N.D. Tex. Jan. 15, 2014)(unpublished)("a VA disability determination is entitled to great weight unless the ALJ adequately explains the valid reasons for not doing so.").

"An ALJ's disagreement with the VA's finding of disability is not reversible error if the record reflects consideration of that finding." Allison v. Berryhill, No. 1:16-CV-0170-BL, 2018 WL 1274853, at *6 (N.D. Tex. Feb. 16, 2018)(slip op.) (quoting Duke v. Colvin, No. 5:16-CV-151-DAE, 2016 WL 6651394, at *5 (W.D. Tex. Nov. 10, 2016)(unpublished)).  However, reversible error is found when the "ALJ fails to consider the disability rating and explain [his] reasons for discounting it." Id. (quoting Rasco v. Berryhill, No. 4:17-CV-946, 2018 WL 587948, at *4 (S.D. Tex. Jan. 5, 2018)(unpublished)).

The ALJ mentioned Plaintiff's VA rating once in his opinion, stating, "[O]n December 3, 2015, records indicated the claimant had been diagnosed with PTSD and he was 100 percent disabled in the Veteran's Administration system."[213]  The VA rating was not discussed in the hearing.

Here, the court cannot assume the ALJ considered the VA

---

[213]  See Tr. 27.

disability determination.  While the ALJ discussed records from the VA in his decision, the ALJ gave no explanation as to why the VA rating was not given great weight.  Thus, because the ALJ was required to consider the VA disability rating in determining whether Plaintiff was disabled, and the record indicates that she did not do so, the court finds that the ALJ committed reversible legal error.

Defendant contends that the ALJ's failure to consider the VA rating is harmless error.  However, courts have rejected this argument as "the failure of the ALJ to consider the VA's disability determination is the type of legal error that is not subject to the harmless error analysis as the Court cannot try issues de novo, reweigh the evidence, nor substitute its findings for those of the Commissioner."  Allison, 2018 WL 1274853, at *9 (quoting Arebalo ex rel. Arebalo v. Astrue, No. 4:09-CV-496-A, 2010 WL 6571087, at *4 (N.D. Tex. Oct. 7, 2010)(unpublished)).  The court agrees and declines to reweigh the evidence.  This case should be remanded for the ALJ to consider Plaintiff's VA disability rating.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED IN PART AND DENIED IN PART** and Defendant's motion be **DENIED**, and that this case be **REMANDED** to the Commissioner for further consideration in conformity with this opinion.

The Clerk shall send copies of this Memorandum and

Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 17<u>th</u> day of July, 2018.


_____
U.S. MAGISTRATE JUDGE